

FILED

DEC 17 ...

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

In the matter of the Complaint of
VULCAN MATERIALS COMPANY,
owner of the Tug WILLIAM E. POLLE, for
Exoneration from or Limitation of Liability.

Civil Action No. 2:08cv377

## OPINION AND ORDER

This suit in admiralty, arising out of the death of Freddie N. Porter, Jr. ("Porter"), comes

before the Court following a four-day bench trial on Claimant Cassita Massiah's ("Massiah")

wrongful death claim against Plaintiff Vulcan Materials Company ("Vulcan") and on Vulcan's

claim for contribution against the United States. The Court ruled from the bench at the trial's

conclusion. However, the Court reserved for later resolution the issue of whether the United

States was properly a party to this action in light of the <u>Feres</u> doctrine, and withheld the entry of

judgment until that matter was settled. The Court now sets forth its findings of fact and

conclusions of law, thereby resolving all outstanding issues in this matter, and enters judgment in

favor of Claimant Massiah.

### I. JURISDICTION

Limitation of liability actions such as this one, arising out of a maritime collision, fall

within the Court's admiralty jurisdiction. <u>See</u> <u>Yamaha Motor Corp., U.S.A. v. Calhoun</u>, 516

U.S. 199, 206 (1996).

## II. FACTUAL FINDINGS

### A. The Navy RHIBs

On October 11, 2007, nineteen-year-old Freddie N. Porter, Jr. and a number of fellow Navy personnel attached to Seal Delivery Vehicle Team Two departed from the United States Navy's Little Creek Amphibious Base ("Little Creek") in five rigid-hull inflatable boats ("RHIBs") for a navigation training exercise. The operation was part of a two-week coxswain course that Porter, a land-based supply clerk, had volunteered to attend. This would be the fourth and last training exercise of the course, and was intended, like the previous exercises, to give the students an opportunity to practice skills they had learned in the classroom over the duration of the course. Before leaving Little Creek, each RHIB's crew completed a pre-operation inspection, verifying, inter alia, the proper functioning of the boats' running lights. Once underway, the RHIBs moved up the James River to Jordan Point, where their crews disembarked to have dinner and await their nighttime return to Little Creek.

When darkness fell, each crew conducted another pre-operation inspection, and again verified that all lights on the boats—including an all-around white light mounted next to the radar dome on the aft mast, and a set of red and green running lights mounted forward in the RHIBs—were functioning properly. This time the crewmembers also verified that each was wearing a functioning chemlight, which would help rescuers spot crewmembers in an emergency. For this return trip, the crews were instructed to stay inside the shipping channel to minimize their chances of running aground or hitting obstacles such as crab pots.

Porter boarded his RHIB, call-sign Tango-2, in the forward lookout position, and fellow student Esteban Angeles ("Angeles") took the helm. Petty Officer Albert Bollinger ("Bollinger") also boarded Tango-2, as the safety observer and qualified coxswain. Bollinger

2

had completed the two-week coxswain course, thereby becoming a qualified coxswain, in December 2006; he subsequently served as a qualified coxswain in several operations. Prior to December 2006, however, Bollinger had no boating experience, and as of October 2007 he had never been a safety observer and had never made the run to Jordan Point.

Other students and safety observers boarded Tango-1 and Tango-3. Officer-in-Charge David Hupp ("Hupp") boarded a fourth RHIB, call-sign Sierra Bravo, along with Lead Petty Officer Julio Rodriguez Vargas ("Rodriguez"). Safety observer Eric Johnson, Chief Kord Nelson, and medical technician Elias Kfoury boarded the second safety boat and fifth boat overall, Sierra Charlie. Tango-2 and Sierra Bravo left Jordan Point first, but were soon passed by the other three RHIBs.

### B. The WILLIAM E. POOLE

Sometime before Porter and his classmates left Jordan Point for the return trip to Little Creek, Captain Rondy Wooldridge maneuvered his tug, the WILLIAM E. POOLE, away from the Campostella docks in Norfolk, Virginia and headed up the James River pushing a six-barge flotilla that was three barges long and two barges wide. With thirty-three years of experience on the James River, Wooldridge had made similar trips thousands of times, most recently as an employee of the Vulcan Materials Company, which owned the POOLE. The barges in front of the POOLE on this particular trip were empty; their decks were approximately twelve feet above the waterline, and a short wall around the perimeter of each barge's cargo box (the "cargo box wall") rose an additional two or three feet off the deck. After getting underway and approximately one hour before sunset, Wooldridge instructed his deckhand, Joseph Christensen, to position and illuminate the flotilla's running lights. Christensen placed the portable lights on the forward

3

cargo box walls of the forward two barges—a green light on the far starboard side, a flashing amber light as close to the center as possible, and a red light on the far port side.

From their perch in the POOLE'S wheelhouse, Wooldridge and Christensen had an expansive view of their surroundings, but a portion of that view was blocked by the empty barges, riding high in the water, that extended about five hundred and eighty-five (585) feet forward of the tug.  In fact, the barges created a blind spot that extended approximately six hundred (600) feet forward of the flotilla's bow at water level.  Thus, much like a driver's inability to see the road immediately in front of his car, Captain Wooldridge and his deckhand could not see the river—or an object on the river, depending on its height—for some distance in front of the flotilla.

After passing the James River Bridge, the POOLE flotilla proceeded north up the James River past Fort Eustis to Hog Island, where it picked up an additional two barges.  These were arranged bow-to-stern and then placed on the port side of the of the existing flotilla, such that the enlarged flotilla comprised a forward row of three barges, a middle row of three barges, an aft row of two barges (in the center and starboard positions), and the POOLE, which was positioned behind the aft center barge.  Christensen then relocated the red and amber lights to positions on the forward barges' front cargo box walls on the far port side and the center of the flotilla, respectively.  Although placing the lights on the cargo box walls in this manner caused them to be higher up than if they were placed on the deck, it also created another blind spot, within which the lights could not be seen from someone on or in the water.  This second blind spot extended approximately ninety feet forward of the bow of the flotilla at water level.

With the lights in position, the POOLE departed Hog Island at around 10:00 p.m. and continued along the James River toward Jamestown Island.

4

## C. The Collision

Winding inland from the Chesapeake Bay, the James River runs north past Fort Eustis and Hog Island, then makes an S-curve around the north end of Hog Island and the south end of Jamestown Island before continuing on to the northwest. Although the river is more than a mile wide throughout this area, the shipping channel through the bend at Jamestown Island is only three hundred (300) feet wide. The eastern end of the channel is marked by buoys 53 (on the south side of the channel) and 54 (on the north side of the channel). As the POOLE cleared the bend around Jamestown Island and headed toward these buoys, there was little if any ambient light; the shores, the water, and the sky were dark. It was windy and the water was choppy, with swells of one (1) to two (2) feet. The swells caused clutter on the POOLE's radar, making it difficult to see objects with small radar returns—such as the RHIBs—on the radar screen.

While the Poole was pushing upriver toward buoys 53 and 54, Tango-2 and the other RHIBs were traveling downriver toward the same buoys. Tango-2's crew noticed but could not identify a white light in the direction of the buoys; the light was the POOLE's spotlight, which Captain Wooldridge had trained on the port bow of the flotilla so that he could better perceive the direction of the flotilla's movement in the water. Onboard Tango-2, Bollinger noted Angeles' confusion about the light and told him to slow down, make a decision about what to do, and then proceed. Angeles reduced throttle, and Sierra Bravo, trailing behind Tango-2, did the same; both boats drifted in the shipping channel with their bows pointed south while their crews tried to make out the source of the light. Rodriguez, who was at the controls of Sierra Bravo, saw a large object on his RHIB's radar, but was unable to visually identify the object. Hupp, also in Sierra Bravo, tried unsuccessfully to identify the object using a night vision monocular.

Meanwhile, Tango-1, Tango-3, and Sierra Charlie had crossed to the other side of the shipping channel and were proceeding downriver. They also saw the light, and eventually identified it as a spotlight on the tug. Kfoury, one of the crew of Sierra Charlie, testified that there was some radio chatter about the tug amongst the RHIBs, but neither Angeles nor Bollinger could recall hearing anything about the tug on Tango-2's radios. No one was using Tango-2's radar; Angeles, who was in the operator's chair, did not know the RHIB was equipped with radar, and Bollinger, the boat's safety observer, did not know how to use it. Although Rodriguez saw something on Sierra Bravo's radar and Hupp saw something through his night-vision monocular, neither conveyed any information about the object to Tango-2's crew.

Within minutes after Tango-2 and Sierra Bravo stopped in the shipping channel, the forward bow of the POOLE's flotilla emerged from the darkness on their port side. Sierra Bravo either maneuvered out of the way or was already out of the way, and avoided being hit. Tango-2 was not so lucky. After a brief attempt to get the RHIB moving, Bollinger dived off the boat's stern, clear of the barges, and Angeles leapt over the starboard side. As the barges ran over him, Angeles tried to swim down, but his life jacket kept pulling him upward against the barges' hulls. Just as he could hold his breath no longer, the flotilla passed and Angeles popped out from under the water. Both Angeles and Bollinger were soon picked up by Sierra Bravo, which had turned on its floodlights as the flotilla passed. All that could be found of Porter, however, was his chemlight, floating free in the water. Porter's body was later found washed up on the beach, with multiple injuries. The injuries had been inflicted by a propeller on the POOLE, and an autopsy conducted by Dr. Whaley, a state medical examiner, concluded that Porter had been conscious until he received a final fatal blow to the head.

Despite the chaos occurring at the front of their flotilla, neither Wooldridge nor Christensen observed anything out of the ordinary from the tug's wheelhouse. They had seen Sierra Charlie, Tango-1, and Tango-3 pass the flotilla on the port side, in formation; they also saw what appeared to them to be a fishing boat, floating outside buoy 54 on their starboard side, that turned on its floodlights as the POOLE passed by. Wooldridge briefly illuminated this boat with his spotlight, but again saw nothing out of the ordinary. The POOLE's crew knew nothing of the collision until they were contacted by the Coast Guard the following day.

Porter was survived by his mother, Cassita Massiah, of Garfield, New Jersey; his father, Freddie Porter, Sr. ("Porter, Sr."), of Brooklyn, New York; and seven siblings: Alexia M. Massiah-Alexis, Jacqueline Massiah-Robeiro, Corlette Massiah, Sophia Porter, Zarria Porter, Alicia Porter, and Dondre Porter. Cassita Massiah was Porter's custodial parent for most of his childhood, though Porter, Sr. had visitation rights and maintained a close relationship with his son. Indeed, Porter had a good relationship with each of his family members. Although he did send money to his mother on occasion, Porter had no dependants at the time of his death.

The parties stipulated that the fair market value of the POOLE immediately following the collision was one million five hundred thousand dollars ($1,500,000.00). The United States made a death gratuity payment to Massiah of one hundred thousand dollars ($100,000.00) shortly after Porter's death, and also reimbursed Massiah for Porter's funeral and burial expenses in the amount of seven thousand twenty dollars ($7,020.00).

### III. LEGAL CONCLUSIONS

The following legal issues require attention, and will be addressed in turn: (1) whether Vulcan is entitled to exoneration or limitation of liability; (2) whether the United States is liable for contribution to Vulcan; and (3) what damages, if any, are appropriate.

### A. Vulcan's Claim for Exoneration or Limitation of Liability

Pursuant to Supplemental Rule F of the Federal Rules of Civil Procedure, Vulcan seeks exoneration from or limitation of liability arising out of the October 11, 2007 collision between Tango-2 and the tug WILLIAM E. POOLE. In a limitation of liability proceeding, the Court must first determine what acts of negligence proximately caused the collision, and then, if necessary, whether the limitation plaintiffs are entitled to limit their liability for their negligence. In re Nat'l Shipping Co. of Saudi Arabia, 147 F. Supp. 2d 425, 430 (E.D. Va. 2000). In admiralty, proximate cause is defined as "that cause which in a direct, unbroken sequence produces the injury complained of and without which such injury would not have happened." Ente Nazionale Per L'Energia Electtrica v. Baliwag Nav., Inc., 774 F.2d 648, 655 (4th Cir. 1985) (quoting Olympic Towing Corp. v. Nebel Towing Co., Inc., 419 F.2d 230, 233 (5th Cir. 1969)).

### 1. Negligence

The Court **FINDS** that both the United States and Vulcan were negligent on the night of October 11, 2007, and the Court further **FINDS** that Porter's death was proximately caused by the negligence of both the United States and Vulcan. The United States negligently operated an unseaworthy vessel by manning Tango-2 with an incompetent crew. See Dickens v. United States, 815 F. Supp. 913, 918 (E.D. Va. 1993) (citing Thezan v. Maritime Overseas Corp., 708 F.2d 175, 179 (5th Cir. 1983)) ("An improperly manned vessel is unseaworthy as a matter of law."). Neither the two students aboard Tango-2 nor its safety observer were properly prepared to operate a RHIB in a busy shipping channel at night. Even Bollinger, the safety observer, had pitifully little experience on the water, and as students neither Angeles nor Porter had sufficient experience to counteract this deficiency. The crew's incompetence, and hence Tango-2's unseaworthiness, was manifest in part by other acts of negligence that night. As Tango-2 and

8

Sierra Bravo traveled downriver in the vicinity of Jamestown Island, they kept to the port side of the channel in violation of Inland Navigation Rule 9 ("Rule 9"), which requires vessels to stay on the starboard side of a channel. 33 U.S.C. § 2009 (2006). Tango-2 safety observer Bollinger instructed Angeles to stop the boat when they were in the middle of the shipping channel, in further violation of Rule 9. Notwithstanding his responsibility for the safe completion of the entire training operation, Hupp failed to prevent or rectify these violations, even though his own RHIB, Sierra Bravo, participated in them. Rodriguez saw a large object—the tug and its flotilla—on Sierra Bravo's radar screen, but, fixated on establishing visual identification of the object, he failed to understand the danger it posed and failed to provide an adequate warning to the crew of Tango-2. Although Tango-2 was also equipped with radar equipment that, if used, could have provided lifesaving information to its crew, safety observer Bollinger did not know how to use it and Angeles did not even know it was there.

Vulcan too was negligent. Inland Navigation Rule 5 ("Rule 5") requires vessels to post a proper lookout. Id. § 2005. Vulcan's own credible expert witness, Captain Raymond Robbins, identified the factors to be considered in deciding whether to post a lookout:  a dark night, bad weather, a narrow channel, a blind spot, and the presence of small boat traffic. These factors were present on October 11, 2007:  the night was dark and windy; the water was choppy, which caused clutter on the POOLE's radar and made it difficult to see small boat traffic on the radar screen; the POOLE was in a narrow channel and, because of the eight barges it was pushing, had a significant blind spot; and Captain Wooldridge testified that small boat traffic is common on the James River. Vulcan presented testimony that safety is better served by keeping both the captain and the deckhand in the wheelhouse, where they have an all-around view of the tug's operating environment, and the Court is persuaded that the deckhand can best contribute to the safe

operation of the tug and tow from the wheelhouse. However, Vulcan presented no evidence to suggest that a third individual could not be posted as a lookout when the above factors indicate that a lookout is required.

When asked when he would post a lookout, Captain Wooldridge replied that he would do so when his vision was impaired. Although the Captain denied his vision was impaired, the Court **FINDS** otherwise. First, the Captain kept his searchlight activated for an extended period of time in order to assist his vision while negotiating a difficult turning maneuver with this large flotilla in a narrow channel on a dark night in choppy waters. Second, neither the captain nor his deckhand saw Tango-2, although they had no difficulty seeing Tango-1, Tango-3, Sierra Charlie, and what turned out to be Sierra Bravo, which they thought was a fishing vessel. Notably, Tango-2 was in the middle of the channel, in the blind spot created by the eight-barge flotilla riding high in the water while being pushed by the POOLE. Clearly the Captain's and his deckhand's visions were impaired by the totality of these conditions. A lookout stationed at the bow of the forward barge probably could not have warned the Captain in time to change his course, but a properly equipped lookout could have warned Tango-2 and alerted the Captain to sound his whistle (horn) as a further warning to Tango-2.

Vulcan also argued that there was insufficient time to post a lookout from the moment Wooldridge and Christensen saw the first three RHIBs pass to the estimated time of the collision. While this is no doubt correct, the small boat factor becomes relevant not just when the presence of small boat traffic has been confirmed, but also when previous experience suggests—as it did here—that small boat traffic is to be expected. All of the factors that inform whether to post a lookout pursuant to Rule 5 were therefore satisfied on October 11, 2007, and Vulcan was negligent in failing to post one. Vulcan's expert witness, Captain Robbins, focused persuasively

on the desirability of locating the deckhand in the wheelhouse, but he did not address the option of a third crewman being posted on the bow of the forward barge. Vulcan regularly operates flotillas at night through this narrow channel with a difficult turn where small boat traffic is to be expected, and it should have manned its crews with a properly equipped third member in order to maintain a proper lookout. Claimant's expert witness, Mitchell Stoller, accused Vulcan of multiple acts of negligence, but only the improper lookout is proven by the evidence.

"Liability for maritime collisions is allocated proportionately to the comparative degree of fault." Nat'l Shipping, 147 F. Supp. at 430 (citing United States v. Reliable Transfer Co., 421 U.S. 397, 411 (1975)). While both the United States and Vulcan were negligent, the negligence of the United States far outweighed that of Vulcan. Accordingly, the Court **FINDS** that the United States was eighty percent (80%) at fault and Vulcan was twenty percent (20%) at fault for Porter's death.

## 2. Limitation of Liability

Having found Vulcan negligent, the Court must now determine whether Vulcan is entitled to limitation of liability.[1] By statute, "the liability of the owner of a vessel for any claim, debt, or liability . . . shall not exceed the value of the vessel and pending freight" if the claim, debt, or liability arose "without the privity or knowledge of the owner." 46 U.S.C. § 30505 (2006). "Privity and knowledge, as used in this statute, have been construed to indicate that a shipowner knew or should have known that a certain condition existed." Hellenic Lines, Ltd. v. Prudential Lines, Inc., 813 F.2d 634, 638 (4th Cir. 1987). If a negligent act or condition could have been discovered by the shipowner through reasonable diligence, the shipowner will be charged with knowledge. Id. (citing Empresa Lineas Maritimas Argentinas S.A. v. United States, 730 F.2d 153, 155 (4th Cir. 1984)). A shipowner seeking limitation of liability bears the

---

[1] This issue may be moot in view of the stipulated value of the POOLE.

burden of proving a lack of knowledge or privity. Id. (citing Coryell v. Phipps, 317 U.S. 406 (1943)).

The Court **FINDS** that Vulcan had privity and is therefore not entitled to limitation of liability. Vulcan should have known that a flotilla traveling on the James River, under the circumstances that prevailed on October 11, 2007, would need a lookout on the bow of the forward barge. Further, it was Vulcan's responsibility to make provisions for the availability of such a lookout. As Captain Wooldridge testified, his deckhand was best utilized as a second observer in the tug's wheelhouse. Thus, a third individual was needed to act as lookout, and Vulcan, not Captain Wooldridge, was responsible for providing that individual.

## B. Liability of the United States

Vulcan contends that it is entitled to contribution from the United States. "Contribution rests upon a finding of concurrent fault." Cooper Stevedoring Co. v. Fritz Kopke, Inc., 417 U.S. 106, 114 (1974). The Court in Cooper Stevedoring explained that when two parties are both at fault, "[t]he interests of safety dictate that . . . they should bear the damage equally, to make them more careful." Cooper Stevedoring, 417 U.S. at 111. Today, however, the "preferred method of federal contribution is allocation on the basis of comparative fault." Franklin Stainless Corp. v. Marlo Transport Corp., 748 F.2d 865, 871 (4th Cir. 1984); see also Reliable Transfer, 421 U.S. at 411. The Court has already found that the United States shares fault with Vulcan for Porter's death, suggesting that contribution would be appropriate. However, because the United States has challenged this Court's jurisdiction over Vulcan's contribution claim, the Court must address that issue before concluding whether contribution is merited.

By motion filed on September 15, 2009, Doc. 51, and again in its Proposed Findings of Fact and Conclusions of Law, Doc. 76, the United States asserts that this Court lacks subject

matter jurisdiction over the claims against the United States under the Feres doctrine. Because of the timing of the motion and the desirability of a complete record, the Court declined to rule on the United States' motion before trial, but it will do so now.

### 1. Subject Matter Jurisdiction over the United States

#### a. The Feres Doctrine

Vulcan's third party complaint against the United States is governed by the Public Vessels Act ("PVA"), 46 U.S.C. § 31101–13, which incorporates consistent provisions of the Suits in Admiralty Act ("SAA"), 46 U.S.C. § 30901 et seq. These acts comprise a broad waiver of the Government's sovereign immunity for admiralty-related claims against the United States. According to the Government, however, the Supreme Court has declined to interpret these acts and others as waiving sovereign immunity (1) for claims brought by active duty members of the armed forces where those claims stem from injuries incurred incident to military service, or (2) for contribution or indemnity claims brought by a party that has been held liable to a service member for injuries incurred incident to service. See Stencel Aero Eng'g Corp. v. United States, 431 U.S. 666 (1977); Feres v. United States, 340 U.S. 135 (1950).

Feres arose out of the death of a serviceman in a barracks fire that allegedly resulted from government negligence. Id. at 137. The executrix of the deceased serviceman's will sought recovery from the United States under the Federal Tort Claims Act ("FTCA"), but the Supreme Court held that "the Government is not liable . . . for injuries to servicemen where the injuries arise out of or in the course of activity incident to service." Id. at 137, 146. This holding was subsequently extended beyond the FTCA, to suits brought under the PVA, the SAA, and other admiralty statutes. See, e.g., Blakey v. U.S.S. Iowa, 991 F.2d 148 (4th Cir. 1993); Potts v. United States, 723 F.2d 20 (6th Cir. 1983) (refusing to limit Feres to suits under the Federal Tort

Claims Act and citing similar cases from the Second, Fifth, and Ninth Circuits); Lewis v. United States Navy, 976 F.2d 726, at *1 (4th Cir. 1992) (stating, in an unpublished, per curiam decision, that "[s]ervicemen are barred from suing the United States for injuries occurring in the course of activity incident to service," even "where the claim is brought pursuant to the Suits in Admiralty Act").

The Feres doctrine has also been extended to third-party indemnity suits against the United States. See Stencel Aero, 431 U.S. at 666. In Stencel Aero, a National Guard officer was injured when his ejection equipment malfunctioned during an in-flight emergency. Id. at 667–68. He sued both the Stencel Aero Engineering Corporation ("Stencel Aero") and the United States for damages, alleging negligence. Id. at 668. Stencel Aero, in turn, sought indemnity from the United States. Id. Citing Feres, the United States argued that it was shielded from Stencel Aero's claim by sovereign immunity. Id. at 668–69.

In analyzing this claim, the Stencel Aero Court identified three factors that had informed the Feres decision: (1) the federal character of the relationship between the Government and military servicemen, see id. at 671 ("[I]t would make little sense to have the Government's liability . . . dependent on the fortuity of where [a] soldier happened to be stationed at the time of the injury."); (2) the existence of a statutory no-fault compensation scheme which makes payments for injuries to servicemen without regard to negligence, see id.; and (3) the adverse effect on military discipline that would result if lawsuits challenging negligent orders or acts made or committed in the course of military duty were permitted, see id. at 672. See also Blakey, 991 F.2d at 150–51. These factors, the Court determined, applied in the indemnity context just as they had in the direct suit context. The Court concluded that "the right of a third

14

party to recover in an indemnity action against the United States . . . must be held limited by the rationale of Feres where the injured party is a serviceman." Stencel Aero, 431 U.S. at 674.

### b. Divided Damages

While the United States argues that Feres and Stencel Aero control in the present dispute, Vulcan contends that neither case affects the admiralty rule of divided damages. This long-standing rule traditionally allowed each party in a maritime collision "to recover from the other one-half of its provable damages and court costs." Weyerhaeuser S.S. Co. v. United States, 372 U.S. 597, 598 (1963). The Supreme Court later modified the divided damages rule to allow for recovery based on comparative fault. See Reliable Transfer, 421 U.S. at 407.

In Weyerhaeuser, a civilian working on a U.S. Army dredge was injured when the dredge collided with another vessel. Id. at 597–98. The civilian received compensation under the Federal Employees' Compensation Act ("FECA"), then sought damages from the Weyerhaeuser Steamship Company, which in turn sought indemnity from the United States under the PVA. Id. at 598. The sole issue addressed by the Court was whether the exclusive liability provision in FECA was intended to limit the long-standing divided damages admiralty rule in mutual fault collisions. Id. at 600. After examining FECA's legislative history, the Court concluded that the divided damages rule remained unaffected by FECA and allowed the indemnity action to proceed. Id. at 604.

Some twenty years later, the Fourth Circuit decided In re the Complaint of Ionian Glow Marine, Inc. v. United States, 670 F.2d 462 (4th Cir. 1982). At issue in Ionian Glow was how, if at all, Feres and Stencel Aero affected the divided damages rule. Id. at 463. Two Navy officers and a crewman had been injured in a collision between a Navy ship and a cargo vessel, and the parties had already agreed to a sixty-five (65) percent/thirty-five (35) percent apportionment of

fault. Id. The owner of the cargo vessel brought suit to determine whether it could include the amount it had paid to the injured servicemen in its damages for purposes of the divided damages rule. Id. The district court had ruled against the cargo vessel owner, reasoning that forcing the government to pay a percentage of the settlement value would violate the rule of Feres and Stencel Aero. The Fourth Circuit reversed. "It is . . . beyond question that if this present suit were in the form of an indemnity suit under the FTCA it would be barred [by Feres and Stencel]. We are faced instead with a mutual fault collision case in admiralty . . . ." Id. at 463. Then, citing Weyerhaeuser for support, the Fourth Circuit determined that the divided damages rule, as modified by Reliable Transfer, remains in full effect notwithstanding Feres and Stencel Aero. Id. at 464 ("Nothing in Feres, Stencel Aero, or the cases that follow convinces us that the Supreme Court intended to alter the Weyerhaeuser rule."). Even though the injured parties were servicemen, the court held that the non-government party could include the amount paid to the servicemen in calculating its total costs for purposes of dividing damages, with the ultimate effect of receiving at least partial indemnity from the United States. Id. at 463–64. Vulcan contends that Ionian Glow controls in the case at bar.

Approximately one year after the Fourth Circuit decided Ionian Glow, the Supreme Court again addressed the indemnity issue in Lockheed Aircraft Corp. v. United States, 460 U.S. 190 (1983). There, the survivors of a civilian government employee who died in the crash of a Lockheed C-5 Galaxy cargo plane received compensation under FECA, yet also brought a wrongful death suit against Lockheed. Id. at 190. Lockheed sought indemnity from the government under the FTCA and, following Weyerhaeuser, the Supreme Court allowed the indemnity claim to proceed. Id. at 191–92, 199. The Court refused to distinguish Weyerhaeuser on the ground that it dealt with a suit for indemnity under the PVA rather than the FTCA. Id. at

16

197 ("[T]hat difference is irrelevant."). The Court further stated that although Lockheed "relie[d] on substantive indemnity law" while the shipowner in Weyerhaeuser "relied on the admiralty divided damages rule," that was "the same irrelevant distinction." Id. 197–98; see also In re Agent Orange Product Liability Litigation, 580 F. Supp. 1242, 1246 (E.D.N.Y. 1984) (stating that Lockheed "explicitly eras[ed] any legal difference between a third-party claim in admiralty and one not in admiralty"). Responding to a suggestion in the dissenting opinion that the facts of Stencel Aero were similar to those before it, the Court explained that in Stencel Aero it had relied "primarily on the military nature of the action." Lockheed, 460 U.S. at 198 n.8.

### c. Jurisdiction over Vulcan's Claim Against the United States

The Court is persuaded that the United States has not waived its sovereign immunity to Vulcan's claim. Of the three factors highlighted in Stencel Aero as relevant to an inquiry such as this, the first is inapplicable here; Vulcan had no relationship, whether federal in character or not, with the government prior to the collision and subsequent initiation of this lawsuit. The second factor does weigh in favor of dismissing the claim against the United States for lack of jurisdiction. The United States made a death gratuity payment to Porter's mother pursuant to the Veteran's Benefits Act, which "provides an upper limit of liability for the Government as to service-connected injuries." Stencel Aero, 431 U.S. at 673. Vulcan, like the Stencel Aero Engineering Corporation, cannot be permitted to circumvent this limitation and "thereby frustrat[e] one of the essential features of the Veteran's Benefits Act." Id.

Turning to the third factor, the Supreme Court accurately predicted that trial in a case such as this would "involve second-guessing military orders, and would often require members of the Armed Services to testify in court as to each other's decisions and actions." Id. Much of the testimony at trial did come from Navy servicemen, who were questioned about their own

17

actions and those of fellow servicemen. Such second-guessing threatens the effectiveness of the military command structure, which relies on unquestioning obedience to military orders. See Chappell v. Wallace, 462 U.S. 296, 300 (1983) ("The inescapable demands of military discipline and obedience to orders cannot be taught on battlefields; the habit of immediate compliance with military procedures and orders must be virtually reflex with no time for debate or reflection."). It makes no difference that this action against the United States was initiated by Vulcan rather than by Porter's estate; "the effect of the action upon military discipline is identical whether the suit is brought by the soldier directly or by a third party." Stencel Aero, 431 U.S. at 673. Additionally, Lockheed's pronouncement that the holding in Stencel Aero was based primarily on the military nature of the action—the same military nature that was absent in Lockheed, but is present here—only increases the weight of this third factor.

Vulcan contends that Ionian Glow establishes the propriety of the Court exercising jurisdiction over its contribution claim against the United States. This contention, however, fails to account for a key difference between Ionian Glow and the case at bar: in Ionian Glow, the United States' liability was not litigated, but here it was. The parties in Ionian Glow brought their dispute to the courts only after agreeing that each would pay a specific percentage of the other side's provable damages, pursuant to the divided damages rule. Ionian Glow, 670 F.2d at 463. As a result, the third Feres factor was not implicated: there was no need for a trial to determine the Navy's negligence, there was no need for servicemen to testify against their colleagues or superiors, and there was no threat of an adverse effect on military discipline because of such a trial or testimony. None of these statements could be made about the present case. Further, the Supreme Court's Lockheed opinion undermines a key step in the logic of Ionian Glow, thereby casting doubt on the propriety of extending Ionian Glow beyond its facts.

Compare Ionian Glow, 670 F.2d 463 ("It is, therefore, beyond question that if this present suit were in the form of an indemnity suit under the FTCA it would be barred. We are faced instead with a mutual fault collision case in admiralty . . . ."), with Lockheed, 460 U.S. at 197–98 ("Here Lockheed relies on substantive indemnity law, while the private shipowner in Weyerhauser relied on the admiralty divided damages rule, but this is the same irrelevant distinction.").

In accordance with the foregoing analysis, the Court **FINDS** that Vulcan's claim for contribution against the United States is barred by sovereign immunity. The Court therefore **GRANTS** the United States' Motion to Dismiss, Doc. 51, and **DISMISSES** the United States as a party to this action.

### C. Damages

### 1. Applicable Law

All the parties agree that this case falls within the Court's admiralty jurisdiction. See Yamaha, 516 U.S. at 206 ("Because this case involves a watercraft collision on navigable waters, it falls within admiralty's domain."). Application of substantive admiralty law is therefore appropriate; however, "[t]he exercise of admiralty jurisdiction . . . 'does not result in automatic displacement of state law.'" Id. (quoting Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 545 (1995)).

Whether state law can be used to supplement maritime law in the wrongful death and survival contexts is an issue that has been addressed by the Supreme Court multiple times, but with conflicting results. In 1886, the Court held that general maritime law did not afford a cause of action for wrongful death. The Harrisburg, 119 U.S. 199 (1886). The strictness of this rule was offset somewhat by the federal admiralty courts' allowance of recovery under state wrongful death statutes—a practice affirmed by the Supreme Court in Western Fuel Co. v. Garcia, 257

U.S. 233 (1921). See Yamaha, 516 U.S. at 206. But, in Moragne v. States Marine Lines, Inc., 398 U.S. 375 (1970), the Court overruled Harrisburg and recognized a federal maritime claim for wrongful death. See Moragne, 398 U.S. at 409. Whether this newly-recognized wrongful death action displaced state wrongful death remedies was addressed in 1996, when the Supreme Court decided Yamaha. There, the decedent was killed in a jet ski accident off the coast of Puerto Rico. Yamaha, 516 U.S. at 202. When her parents sought wrongful-death and survival remedies from the manufacturer, the manufacturer argued that maritime law controlled, to the exclusion of the state remedies. Id. The Yamaha Court explained:

> Traditionally, state remedies have been applied in accident cases of this order—maritime wrongful-death cases in which no federal statute specifies the appropriate relief and the decedent was not a seaman, longshore worker, or person otherwise engaged in a maritime trade. We hold . . . that state remedies remain applicable in such cases and have not been displaced by the federal maritime wrongful-death action recognized in [Moragne].

Id.

Importantly, the Yamaha holding is limited to actions arising out of the death of a nonseafarer. See id. at 205. Whether Claimant may properly seek a remedy under state law wrongful death or survival statutes therefore hinges on whether Porter falls within the definition of a nonseafarer. The Yamaha court explicitly defined nonseafarers as "persons who are neither seamen covered by the Jones Act . . . nor longshore workers covered by the Longshore and Harbor Workers' Compensation Act [("LHWCA")]." Id. at 205 n.2. However, the Court implicitly defined nonseafarer more broadly by basing its holding on the fact that "the decedent was not a seaman, longshore worker, or person otherwise engaged in a maritime trade." Id. at 202 (emphasis added). As Porter is a nonseafarer under either definition, the Court need not decide which particular definition is controlling.

20

The Court has previously **FOUND** that Porter is not a Jones Act seaman. Doc. 47. The Court now **FINDS** that Porter was not a longshore worker under the LHWCA. That act provides for compensation to be paid "in respect of disability or death of an employee." 33 U.S.C. § 903(a). Employees are defined by the Act to include "any person engaged in maritime employment" with the exception, inter alia, of "a master or member of a crew of any vessel." Id. § 902(3). The LHWCA also excludes employees of the United States Government from its compensation provisions. Id. § 903(b). Porter, an employee of the Navy and a member of Tango-2's crew at the time of his death, falls into both of these exceptions, and is therefore excluded from coverage by the LHWCA.

While several cases have found persons technically excluded by the provisions of the LHWCA to be seafarers within the meaning of Yamaha, those cases involve individuals who were only excluded from the LHWCA because of their self-employment. See, e.g., Ghotra v. Bandila Shipping, Inc., 113 F.3d 1050 (9th Cir. 1997) (discussing status of a self-employed marine surveyor hired to inspect cargo holds). Not only was Porter not self-employed, but he also falls into two explicit exceptions to the LHWCA. Therefore, these cases are inapplicable to the present situation.

The Court also **FINDS** that Porter was not otherwise engaged in a maritime trade for purposes of Yamaha's definition of nonseafarers. Porter was a land-based supply clerk with the Navy. See Doc. 47 at 1. The coxswain course in which he was participating at the time of his death involved only four onboard exercises, while the remainder of the course took place in the classroom. Further, the course was not intended as training for a new position; rather, it was offered on a voluntary basis to give individuals such as Porter basic skills that would allow them to serve as coxswains should they be called upon to do so. Despite the fact that Porter died while

manning a RHIB, a broader look at his day-to-day responsibilities shows that he spent very little time on the water. See id. at 1–2. Thus, while Porter cannot be labeled a recreational boater, as was the decedent in Yamaha, he also was not "otherwise engaged in a maritime trade." Yamaha, 516 U.S. at 202.

Having found that Porter was not a Jones Act seaman or a longshore worker under the LHWCA, and that he was not otherwise engaged in a maritime trade, the Court **FINDS** that Porter was a nonseafarer within the meaning of Yamaha, and Claimant Massiah is therefore entitled to state law remedies. This does not mean, however, that Claimant can recover under both the state wrongful death and state survival statutes. Virginia law is clear that simultaneous recoveries under wrongful death and survival actions are not permitted. Hendrix v. Daugherty, 457 S.E.2d 71, 75 (Va. 1995). Further, because Porter's death was caused by the negligence of the United States and Vulcan, only wrongful death remedies, rather than survival remedies, are appropriate. See Lucas v. HCMF Corp., 384 S.E.2d 92, 94 (Va. 1989).

### 2. Available Damages

In light of the foregoing discussion, Virginia's wrongful death statutes will govern the award of damages, and the Court need not consider the types of damages available under general maritime law. Of the categories of damages available under Virginia law for wrongful death, the only categories relevant to this action include damages for "[s]orrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the decedent," and "[r]easonable funeral expenses." Va. Code. Ann. § 8.01-52. These damages are to be awarded to Porter's parents and siblings. See id. § 8.01-53(A). The Court has found no evidence of conduct rising to the minimum level required for the imposition of punitive damages, and therefore declines to award such damages. See id. § 8.01-52(5).

Virginia adheres to the principle of joint and several liability. "If separate and independent acts of negligence of two parties directly cause a single indivisible injury to a third person, either or both wrongdoers are responsible for the whole injury." Sullivan v. Robertson Drug Co., Inc., 639 S.E.2d 250, 256 (Va. 2007). Such is the case here; Porter's death was caused by the separate and independent acts of negligence of the United States and Vulcan. But for sovereign immunity, both parties would be jointly and severally responsible for the whole injury. Sovereign immunity does protect the United States from liability, however, and as a result Vulcan alone is monetarily responsible for the full amount of damages awarded by the Court.

### 3. Funeral Expenses and Death Gratuity Payment

Shortly after Porter's death, the United States made a death gratuity payment to Claimant Massiah, and also reimbursed Claimant for the expenses of Porter's funeral. These payments give rise to the issue of whether the total amount of damages awarded to Claimant should be reduced by the amount of the compensation she has already received from the United States.

An injured party "should be made whole by the tortfeasor, not by a combination of compensation from the tortfeasor and collateral sources." Bullard v. Alfonso, 595 S.E.2d 284, 286 (Va. 2004) (quoting Acuar v. Letourneau, 531 S.E.2d 316, 323 (Va. 2000)). Compensation from a collateral source is therefore disregarded in assessing tort damages. United States v. Price, 288 F.2d 448, 450 (4th Cir. 1961) (applying Virginia law). Still, the mere fact that compensation comes from a tortfeasor does not preclude the possibility that it is from a collateral source; this is ultimately determined by examining the nature of the compensation. Id. In Price, for example, payments made by the Government to a personal injury plaintiff pursuant to the Civil Service Retirement Act ("CSRA") were deemed a collateral source even though the Government had been found liable in tort under the Federal Tort Claims Act. Id. at 449. The

court reasoned that the CSRA was not designed to compensate government employees for particular injuries suffered, but rather to provide "retirement benefits, payable because of age or disability, and from a special fund derived in large measure from the contributions of the employees." Id. at 450.

While sovereign immunity shields the United States from liability arising out of this dispute, the United States nevertheless retains its status as a joint tortfeasor in negligently causing Porter's death. The Court must still determine, though, whether the payments made by the United States constitute compensation from a collateral source. The Court **FINDS** that the funeral expenses did not come from a collateral source, but that the death gratuity payment did. Virginia law specifically provides for the recovery of funeral expenses in a wrongful death action. Va. Code Ann. § 8.01-52. Such expenses are readily quantifiable and identifiable, and Claimant would clearly benefit from a double recovery absent a set-off in the judgment for the expenses already reimbursed. Such a result would run counter to the principle that a tort victim is entitled to no more recovery than is necessary to be made whole. See Bullard, 595 S.E.2d at 288 (quoting Schickling v. Aspinall, 369 S.E.2d 172, 174 (Va. 1988)) (explaining that the collateral source rule is intended to balance this principle with the principle that a defendant is liable for all damages that proximately result from his wrong). Unlike the funeral expenses reimbursement, the death gratuity payment bears no relation to the damages recoverable under Virginia law. It is simply a payment made to the families of deceased servicemen, irrespective of negligence. See Stencel Aero, 431 U.S. at 671. The mere coincidence that the United States is also a joint tortfeasor should not act to diminish the liability of the joint tortfeasors and excuse them from compensating Claimant for all the damages that proximately resulted from their

wrong. See Bullard, 595 S.E.2d at 288. Accordingly, the Court will not reduce the judgment by the amount of the death gratuity payment.

### 4. Prejudgment Interest

Having turned to substantive state law to determine what damages are available to Claimant and who is responsible for paying those damages, the Court also turns to substantive state law to determine whether to award prejudgment interest on the assessed damages. Under Virginia law, prejudgment interest is a discretionary matter for the courts. Va. Code Ann. § 8.01-382 (explaining that courts "may provide for interest on any principal sum awarded, or any part thereof").

Vulcan's liability in this matter was far from clear as this case proceeded to trial, and only at the conclusion of trial did the Court quantify the damage done by the combined negligence of Vulcan and the United States. Unlike in a typical maritime collision case, the damages awarded here were not and could not have been calculated simply by looking at some estimated bill or actual receipt. The parties therefore had no way of knowing before trial if the Court would award damages or, if it did, how much the Court would award. Additionally, the Court has taken a fairly significant amount of time to deliberate on the issues that remained unresolved following the trial, and has delayed entry of the judgment until the filing of this opinion. To require Vulcan to pay prejudgment interest during that time period would be to work injustice. Exercising its discretion, then, the Court **DECLINES** to award prejudgment interest in the instant matter.

### IV. JUDGMENT

Having **FOUND** Plaintiff Vulcan Materials Company to be jointly and severally liable for the wrongful death of Freddie N. Porter, Jr., and in accordance with the damages provisions

of Virginia law, the Court **GRANTS** judgment for Claimant in the amount of one million two hundred fifty thousand dollars ($1,250,000.00), to be distributed as follows:  six hundred thousand dollars ($600,000.00) to Cassita Massiah, Porter's mother and custodial parent; three hundred thousand dollars ($300,000.00) to Freddie Porter Sr., Porter's father and non-custodial parent; and fifty thousand dollars ($50,000.00) to each of Porter's seven siblings.  Although Claimant is entitled to recover her expenses for Porter's funeral, the United States has already reimbursed those expenses, and accordingly no provision is made therefor in this judgment.

The Clerk is **REQUESTED** to send a copy of this order to all counsel of record.

It is so **ORDERED.**

/s/
Henry Coke Morgan, Jr.
Senior United States District Judge

HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, VA
December 17, 2009